## LOVE v. WILSON.

1. PARTNERSHIP—CONSTRUCTION OF AGREEMENT—FINANCIAL OPERATION.

Trial court's finding in dissolution proceeding that financing of partnership dealing in oil and gas properties was to be conducted by the mortgaging and hypothecation of partnership assets rather than exclusively through funds furnished by defendant partners *held*, a proper construction of the partnership agreement.

2. SAME — CONSTRUCTION OF AGREEMENT — RETURN OF CAPITAL — PROFITS.

Construction of partnership agreement relative to dealing in oil and gas properties whereby defendant partners were to receive their money back before there was any division of profits *held*, proper under evidence adduced.

3. SAME—DURESS—FRAUD—EVIDENCE.

Claims of coercion, duress, fraud, conspiracy and deceit on part of defendant partners, made by appellant operating partner upon dissolution of firm dealing in oil and gas properties, *held*, not substantiated under record presented.

4. SAME—RATIFICATION.

Operating partner's acceptance of funds and use of them for partnership purposes ratified the act of another partner in signing notes at bank to obtain operating funds, even if the signing partner were without authority to obligate the firm in the first instance.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2]  40 Am Jur, Partnership §§ 25, 26.
[3]  20 Am Jur, Evidence § 1177 *et seq.*
   40 Am Jur, Partnership § 250.
[4]  40 Am Jur, Partnership §§ 145, 146.
[5]  40 Am Jur, Partnership § 265.

5. SAME—DISSOLUTION—FINDING OF TRIAL COURT.
 Trial court's finding in partnership dissolution proceeding that
 plaintiff operating partner had failed to establish right to
 assets of firm will not be reversed, where it may not be said
 the decree did not accord with the just rights of the parties.

Appeal from Wayne; Murphy (Thomas J.), J. Submitted June 9, 1961. (Docket No. 43, Calendar No. 48,582.) Decided November 30, 1961.

Bill by Davis M. Love against Ralph C. Wilson, Jr., and Teena K. Wilson to dissolve partnership of D. M. Love Associates and determine the interests of partners therein, against Ralph C. Wilson, Sr., to reach partnership property and determine that certain transactions enhanced partnership assets, and against National Bank of Detroit, a Federal banking association, to determine that certain banking transactions created partnership funds. Decree of dissolution entered determining rights of individuals contributing capital to the partnership and dismissing bill as to defendant bank. Plaintiff appeals. Affirmed.

*Wurzer, Higgins & Starrs* (*John T. Higgins, John R. Starrs,* and *Robert A. Macdonell,* of counsel), for plaintiff.

*Dahlberg, Simon, Jayne, Woolfenden & Gawne,* for defendant Ralph C. Wilson, Jr.

*James E. Haggerty,* for defendants Ralph C. Wilson, Sr., and Teena K. Wilson.

*Dickinson, Wright, McKean & Cudlip* (*Daniel J. Tindall, Jr.,* of counsel), for defendant bank.

SOURIS, J. The following opinion, which I adopt as my own, was written by Justice TALBOT SMITH prior to his departure from this Bench:

This case arises out of a partnership in oil and gas operations. The partnership agreement was executed by Davis M. Love, plaintiff and appellant here, Teena K. Wilson and Ralph C. Wilson, Jr., defendants and appellees. Defendant and appellee Ralph C. Wilson, Sr., the husband of Teena K. Wilson and father of Ralph C. Wilson, Jr., acted as agent for his wife in the matters about to be described.

The partnership was to begin on July 1, 1951. The agreement is dated June 29, 1951, and bears the notarized acknowledgments of all 3 partners that they signed on that date, but plaintiff Love asserts that it was actually executed in September, 1951, after partnership operations had begun. The agreement provides generally for the location, acquisition and development of oil and gas properties. The partnership was to be known as "D. M. Love Associates." Love was designated the "operating partner." He was to devote his full time to partnership affairs and to receive a guaranteed salary of $500 per month plus expenses. He was to hold title to the real estate acquired by the firm and to have authority to sign all partnership instruments.

The Wilsons were "consulting" partners who were required to devote no time to the partnership and whose duties and responsibilities were not specified. Each partner was to have an equal 1/3 interest and was to share thus in all gains and accretions. Upon dissolution of the firm, the agreement provided for conveyance of realty and cash (after payment of debts) to the partners "according to their interest." The agreement was utterly silent as to provisions for contribution or return of capital, and from this circumstance, in large part, arises the litigation.

Love asserts that there was an oral agreement among the parties that the Wilsons were to furnish all of the capital required by the partnership and that they agreed to make an initial contribution of

$100,000. He claims that they failed to perform the latter promise early in July, 1951, shortly after partnership operations were begun. He alleges that instead of making an initial contribution of $100,000, Mr. Wilson, Sr., deposited only $5,000 and informed him that they would make further contributions of ·capital only for "individual deals", subject to their approval. Love claims that he had no choice but to acquiesce in this violation of the parties' previous ·oral agreement because he had already resigned from his previous position and the Wilsons "had him over .a barrel." The Wilsons admit that they had a verbal understanding with plaintiff to advance such operating capital as might be required but deny that they agreed to make an initial contribution of $100,000 or to furnish personally all of the capital required by the firm. As we shall see, plaintiff's case rests almost entirely on his ability to sustain the latter proposition.

Operations of the partnership were by no means a financial success. Losses ranged from about $5,100 in 1951 to more than $135,000 in 1953. The balance sheet for December 31, 1954 (immediately before plaintiff began the present litigation), shows that the Wilsons had contributed over $260,000 of capital but that accumulated losses were over $275,000. Even with a credit for depletion the net worth of the firm at the end of that year was a *minus* $1,793.59. During this period, of course, plaintiff Love had been ·collecting his $500 per month salary and expenses in. accordance with the terms of the partnership agreement.

Twenty-eight wells were drilled, of which 5 pro-·duced oil. All of the producing wells were located in Kansas, on property in which both D. M. Love Asso-·ciates and the Peel-Hardman Oil Producers had fractional oil lease interests. Peel-Hardman was the "operator", that is to say, arranged for the drilling

and for management of the leases. In June, 1953, Love and the Ralph Wilsons, Sr. and Jr., brought Mr. Hardman to Detroit for the purpose of obtaining funds needed for drilling operations. A so-called "oil flow loan" to Peel-Hardman was negotiated with the defendant National Bank of Detroit, secured by mortgages on Peel-Hardman's and D. M. Love Associates' fractional interests in the oil leases. It should be observed that the latter mortgage was signed by Love, and that at the same time he and Mr. Wilson, Sr., executed separate instruments giving their personal guarantees for repayment of the loan to Peel-Hardman.

During the latter part of 1953, D. M. Love Associates became hard pressed for funds to meet current operating expenses and Love advised Mr. Ralph Wilson, Sr., in a series of letters that past due bills exceeded the firm's bank balance by a substantial amount. In November, 1953, D. M. Love Associates applied to the defendant bank for a loan. Loans of $40,000 and $50,000 were obtained in November and December; it should be observed that the promissory notes were signed by Love as "operating partner" and were secured by a mortgage on certain named oil leases, also signed by Love. Another loan of $30,000 was also obtained during December; the promissory note was again signed for the firm by Love, but the security consisted of the personal guarantees of the Wilsons and a pledge by them of 10,000 shares of stock in the Michigan Chemical Corporation.

Subsequent operations of the firm continued to result in substantial losses. During 1954 the partners appear to have had a difference of opinion as to how invested capital was to be returned (we have already noted that the partnership agreement was silent in this respect). On October 5, 1954, the partners executed the following agreement:

"October 5, 1954

"Memorandum of agreement drawn this day between the partners of D. M. Love Associates, D. M. Love, Ralph C. Wilson, Jr., and Teena K. Wilson.

"It is our mutual understanding and agreement from this day forward that any profit accruing from here on will be distributed as follows:

"Ralph C. Wilson, Jr. and Teena K. Wilson will receive an amount equal to their tax free invested dollars.

"Ralph C. Wilson, Sr., is to receive the return of his tax free dollars invested for him by D. M. Love Associates.

"This return of invested capital shall be made after all obligations of the partnership are satisfied.

"It is further mutually agreed that after the above has taken place then all profits accruing from a sale of the properties in their entirety, or the oil runs, or a sale of any equipment, oil leases, properties, or net income of any nature shall be divided equally between the 3 partners.

"/s/ TEENA K. WILSON
"/s/ RALPH C. WILSON, JR.
"/s/ D. M. LOVE

"Witness
"/s/ RICHARD O. MORRISON
"/s/ RALPH C. WILSON
"/s/ L. TODD"

This agreement by no means put an end to the dispute between Love and the Wilsons. In the latter part of October, 1954, Mr. Wilson, Jr., wrote to Mr. Love that partnership expenses would thereafter "have to be pared to an absolute minimum" and concluded, "I do hope you will be successful in lining up some other work." Matters came to a head at a meeting in Detroit in December, 1954, at which Love claims Mr. Wilson, Sr., attempted to discharge him, to which Love replied that he was a partner, not an employee, and therefore not subject to being

"fired". Love stated that he was willing to have a dissolution and a distribution of the assets of the partnership. On December 16, 1954, the Wilsons' attorney gave Love a memorandum in which he asserted that Love was merely "an employee of the Wilsons." On January 27, 1955, Love initiated the present litigation, praying for dissolution of the firm, an accounting, and appointment of a receiver. He also sought to charge his partners with personal liability for the bank loans on a theory which will be discussed below. A receiver was appointed on February 17, 1955, and dissolution was ultimately decreed. Love now brings this appeal from the terms of that decree.

Love's basic argument is that his partners agreed to furnish *all* of the capital required for the firm's operations and that he was to acquire a vested 1/3 interest in their capital contributions from the very moment they were made. Hence, when capital was obtained by means of loans to the firm from the defendant bank, that this was a violation of the agreement, Love asserting that the credit of the firm was thereby improperly used to relieve the Wilsons of an obligation which should have been theirs alone. He further states that when Wilson, Jr., executed a renewal note on behalf of the partnership in December, 1954, Wilson did so without authority, since the partnership agreement in paragraph 7 gives Love what he claims to be sole authority to execute such instruments. In addition, Love says that the bank knew of Wilson's lack of authority and that it is therefore secondarily liable to refund to the partnership the payments made on the note, although Love concedes that he accepted the proceeds of the loan and used them in carrying on the business of the firm.

The Wilsons do not deny that they agreed to furnish operating capital for the venture, but say they could properly do so either by making personal ad-

vances or by arranging for loans secured by assets of the partnership.

The testimony taken provides no indisputable answer. Several witnesses testified substantially to the effect that the Wilsons were required to "advance" operating capital, or to furnish it, or to put it in, or to put it up. Love places great stress on the admission of Mr. Wilson, Sr., that the Wilsons did agree to "furnish the capital on the deals we approved," but such a statement obviously does not clearly define how the capital was to be furnished. Wilson, Sr., emphatically denies that the Wilsons agreed to finance the partnership exclusively out of their own personal funds:

*"The Court:* Did you ever tell Mr. Love that you'd furnish all the capital and the partnership wouldn't borrow a nickel?

*"A.* No, sir, I never did. As a matter of fact, your Honor, I had contacts with other banks because we thought we were in the oil business and were going to have a lot of production, and Mr. Love had knowledge of it, that I had talked to banks in Chicago, and I had appointments arranged with banks in New York, and I discussed with the National Bank of Detroit that some day we may need a million dollars, and now I want to know if you're going to be able to loan us a million dollars, and they said when we come up to that point, there's no reason why we shouldn't loan you that much money."

The partnership agreement itself, moreover, contained in paragraph 5 words which suggest that borrowing by the partnership was contemplated, a conclusion which also appeared obvious to the court below. The relevant words from the agreement are the following:

"Without in any manner limiting the foregoing generalization, the partnership may locate, purchase, lease or otherwise acquire, hold, own and sell, *mort-*

*gage, hypothecate,* assign or otherwise dispose of lands in whole or in part." (Emphasis added.)

It is, of course, possible for partners to agree that one or another of them shall personally, and unaided, and out of his private funds, finance a business operation, however large it may be, to the exclusion of any other method of financing, whether by borrowing against the assets of the business or otherwise. But an agreement to assume such an obligation would be most unusual and so at variance with the normal conduct of business affairs that its existence may be established only by clear and convincing evidence. Such evidence is not before us. Indeed, the written evidence before us looks the other way, and the testimony and pleadings do not conclusively establish the existence or the significance of the supposed oral agreement as to capital contributions. We are not persuaded of the chancellor's error in his interpretation of the agreement of the parties.

As to the interest of the partners in the capital, once it was furnished, again the parties are diametrically opposed. The agreement later executed by the parties with respect thereto is set forth in full *supra.* We agree with the trial chancellor that it sought an adjustment of existing differences and that no question of consideration is involved.* It is obvious from a reading of this instrument, not drafted by counsel but by one of the parties hereto, Ralph Wilson, Sr., that it reeks with ambiguities. The word "profit" is used twice therein, each time in a different context. With respect to the interpretation of this instrument, Love takes the position that there "are no ambiguities" and that by its express terms the Wilsons may recover their "tax free dollars" invested in the firm only "from profits".

---

* 11 Am Jur, Compromise and Settlement §§ 3, 4, pp 248, 249; *Sherman* v. *Phelps,* 297 Mich 153.

He therefore asserts that if there are no profits (as there were not) the Wilsons are not entitled to any preference in the return of their invested capital. The Wilsons vigorously deny that this is a proper interpretation of the agreement of October 5, 1954. They assert that the second paragraph clearly contemplates a continuing partnership, during which continuance the profits, if any, shall be allocated first to the repayment of the Wilsons' "tax free invested dollars." The Wilsons claim that the last paragraph is the only one which contemplates termination of the partnership and that in that event it clearly provides in the words "after the above has taken place" that return of capital contributions and payment of partnership obligations would take precedence over any division of "profits" among the 3 partners.

The court was aided in its interpretation of this instrument and the original agreement by the testimony of several witnesses. One of Love's own witnesses, qualified as an expert in the oil business, gave the following testimony which substantially reinforces the Wilsons' position:

"*A.*  *  *  *  I don't know how they handle the thing in their business, but as I understand it, they have a 3-way partnership, and the Wilsons furnished all the money, and I think it was similar to any back-end deal that you have in the oil industry. As you know, in the oil industry, particularly in Kansas where there's thousands of operators, independent operators, they develop a deal, promote a project and get some major company or other independent operator, or some rich man in a high-tax bracket, to pay the freight, and carry them for an interest. I know of many deals of boys that used to work for me that have told me about their arrangements with independent producers whereby they're giving—had been given interests on the back-end deals as to the

—on a particular field, for example, they go out and drill a project; if that well becomes productive, the operator will pay for all the costs of operation, and so forth, receive all the benefits of intangible drilling, receive all the depletion allowance. And then *after he gets his money back* [emphasis added] this particular person who developed the deal and found the deal, brought it to him, comes in anywhere from a quarter up to as much as a half interest."

Again with respect to return of capital the same witness testified:

"*A.* Well, it was my understanding—whether they told me about it, or I knew about it, how I found it out I don't know—but that was their—their part of the—of the partnership arrangement, they were to furnish all the capital, as I understand it. Whenever they got production upon a certain property, I presumed it was the same as all back-end deals, that they would *get their capital back* [emphasis ours] and have the benefit of depletion and intangible costs and—

"*Q.* In that form?

"*A.* —In form, and they'd get the charge-offs and benefits of tax benefits on dry holes."

And, further,

"*Q.* I believe you testified that in these back-end deals, I think you called them—

"*A.* Yes, sir, that's what I called them—

"*Q.* —you said after the man who put up the money got his money back, they often cut the finder in for a percentage—

"*A.* That's right.

"*Q.* —of the lease, or whatever it was.

"*A.* Yeah."

The Wilsons testified similarly; for example, Ralph Wilson, Jr., stated that it was originally agreed that "for whatever money we advance we would like to have it returned, we want returned

before there is any division of profits." The trial court accepted the Wilsons' construction of the instrument as expressing the intent of the parties and upon the record before us we cannot say it was in error.

We have noted heretofore Love's acquiescence in the borrowing program through his signing of the notes and mortgages. But this, he says, was under duress: He had to go along, he was already in too deep. As we have seen, Love claims that he was subjected to unconscionable duress even at the very beginning of his partnership affiliation, when the Wilsons allegedly violated their alleged agreement to make an initial capital contribution of $100,000.

He says that he took no action at that time because he had left his former job and the Wilsons "had me over the barrel" and "forced me to accept the new conditions and terms." With respect to the partnership loans which were made several years later, Love makes the same claim of coercion and duress. We can understand the predicament of one who suddenly finds himself "over a barrel" through no fault of his own and in such a case we may extend him a helping hand. But if after the passage of several years he claims he is still over that same barrel, we are inclined to question either his good faith or the existence of the barrel. We are no more impressed than was the trial chancellor by plaintiff's assertions of fraud, conspiracy, and deceit. Misunderstandings apparently existed, but we are not impressed by appellant's allegations of moral turpitude.

As we have observed, Love urges that defendant Ralph C. Wilson, Jr., is primarily liable, and the defendant bank secondarily liable, to refund to the partnership an amount equal to the proceeds of all the notes of the firm signed by Ralph Wilson, Jr. Love's theory is that Wilson's execution of such in-

struments was unauthorized according to the terms of the partnership agreement, that Wilson knew he lacked such authority and that Wilson's lack of authority was brought to the attention of the bank.

As authority for his position, Love relies on paragraph 7 of the partnership agreement, which he claims gave him sole authority to execute instruments for the partnership:

"7. All contracts, conveyances, agreements and instruments of every kind and character which require execution by the partnership shall be signed by the operating partner."

The Wilsons say that this clause was intended to centralize authority in the operating partner and not to act as a limitation upon the authority of other partners, pointing out that in the very next paragraph all 3 partners were given the express authority to sign checks on behalf of the firm. The Wilsons also deny that Love protested the authority of the younger Mr. Wilson to execute promissory notes for the firm and in fact assert that he agreed to this procedure. We do not find it necessary to resolve these matters of veracity. That has been done and not, in our opinion, with unjustifiable results. But there are other circumstances conclusive of the issue. Appellant Love knew beyond question that Ralph Wilson, Jr., did sign notes for the partnership and he, Love, as operating partner, accepted such funds and used them for partnership purposes. Without more, we have here a ratification within the rule of *Leesburg State Bank* v. *Pinner,* 256 Mich 261.

Under the view we have taken of the case, and that of the trial chancellor, there is no merit in the additional issues presented. The plain truth of the matter is that the trial chancellor was not impressed by the testimony of the plaintiff. The chancellor was there; we were not. But it is clear that upon

such a record as is before us, replete with charges of fraud, deceit, oppression, and chicanery, and countercharges of lies and distortions of fact, we will not reverse the trier of the facts unless we find that the decree below does not accord with the just rights of the parties. We cannot so find. We are not convinced that we would have reached another result had we sat upon the woolsack in the court below.

Affirmed. Costs to appellees.

BLACK, EDWARDS, and KAVANAGH, JJ., concurred with SOURIS, J.

DETHMERS, C. J., and CARR and KELLY, JJ., concurred in result.

OTIS M. SMITH, J., took no part in the decision of this case.